Michael C. **COLLINS**, et al., Plaintiffs,

v.

**SCHWEITZER, INC.**, et al., Defendants.

Civ. No. 89–3056.

United States District Court,
D. Idaho.

Oct. 2, 1991.

---

Hollis H. Barnett, Campbell, Dille, Barnett & McCarthy, Puyallup, Wash., Paul N. Luvera, Jr., Paul Luvera & Associates, Mt. Vernon, Wash., Robert L. Jackson, Lynn Scott Hackney & Jackson, Boise, Idaho, for plaintiffs Collins.

Peter C. Erbland, Paine, Hamblen, Coffin, Brooke & Miller, Coeur d'Alene, Idaho, for defendants Schweitzer, Inc. and World Wide Ski Corp.

Steven K. Tolman, Hollifield, Tolman & Bevan, Twin Falls, Idaho, for defendant Goodwin–Cole, Inc.

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

RYAN, Chief Judge.

### I. FACTS AND PROCEDURE

The above-entitled action was brought by Plaintiffs Michael C. Collins, a resident of the State of Washington, and his two daughters, Leslie Collins and Barbara Collins, against Schweitzer, Inc. (Schweitzer), an Idaho corporation, and World Wide Ski Corp., a Colorado corporation doing business as NASTAR, for personal injuries and other damages arising from a skiing accident in which Michael C. Collins was injured at Schweitzer Ski Area near Sandpoint, Idaho, on January 31, 1988.

This suit was originally filed in the United States District Court for the Eastern District of Washington on January 27, 1989. The defendants then contested jurisdiction. Schweitzer moved to dismiss for lack of personal jurisdiction, and NASTAR raised the affirmative defenses of lack of personal jurisdiction and lack of subject matter jurisdiction. After a hearing, the United States District Court for the Eastern District of Washington denied the respective motions and on September 5th,

1989, ordered venue of the case transferred to the District of Idaho.

After transfer of the case to the District of Idaho, the plaintiffs filed an amended complaint naming several new defendants, including Defendant Goodwin–Cole, Inc. (Goodwin–Cole), a California corporation. The goal of the amended complaint was to name the manufacturer of the fence at issue in this case. All of these new defendants, except Goodwin–Cole, were later dismissed by an order dated April 10, 1990.

The facts surrounding the accident, based on the affidavits, depositions and other evidence submitted to the court, are as follows. On January 31, 1988, Plaintiff Michael C. Collins, then a resident of Idaho, was skiing at Schweitzer Mountain Resort operated by Schweitzer in Bonner County, Idaho. After payment of an admission fee, Collins entered into a NASTAR ski race conducted by Schweitzer. After crossing the finish line of the race, Collins fell head first and slid down the hill, through a mesh fence surrounding a lift tower, and struck the lift tower with the back of his neck crushing certain vertebrae, which rendered him a quadriplegic.

Collins was an expert skier and an avid athlete. He held a season pass at Schweitzer and the 49 Degrees North Ski Area for several years. He took part in 40 to 60 NASTAR races a year at the 49 Degrees North Ski Area from 1979–1983 (for a possible total of 240 races) and continued to ski in NASTAR races after moving to Sandpoint in 1984. His skiing improved to the point that he became one of the top-rated skiers in his age group in the NASTAR program in the Northwest. Nevertheless, he acknowledged in his depositions that he considered NASTAR to be simply a part of recreational skiing and that he competed mostly against his own race times.

NASTAR is a Colorado corporation which engages in the business of promoting ski races by entering into promotional contracts with ski resorts around the country. The races are for amateurs—*anyone* may enter by paying an entrance fee of $4.00—and NASTAR keeps track of a skier's times so that he can gauge whether his skiing ability is improving. The objectives of NASTAR races are to increase interest in skiing and to provide a means for recreational skiers to improve their skiing ability. Such races are essentially *non-competitive* because the skier's main objective is to improve his own time scores.

Plaintiffs brought suit against Schweitzer for negligence in the setting of the race course, asserting that the ski area set the finish line too close to the lift tower and that they failed to adequately protect the tower with fencing and padding. The lift tower was approximately 123 feet (41 yards) down the slope from the finish line, with the fall line going away from the tower, and approximately 48 feet (16 yards) to the left (looking up the hill) from the finish line. There was a fence placed in front of the tower in an "S" pattern, and there was padding around the tower.

Plaintiffs brought suit against NASTAR on the basis of vicarious liability, arguing that NASTAR and Schweitzer entered into a contract which created an agency relationship with NASTAR being the principal and Schweitzer the agent. Plaintiffs allege that NASTAR breached a duty to use reasonable care in instructing Schweitzer on the proper manner of setting a race course. Plaintiffs also allege that NASTAR breached a duty to inspect the course to ensure that it complied with industry standards and the standards NASTAR set forth in its operating manual which it supplied to Schweitzer.

Plaintiffs brought suit against Goodwin–Cole for negligence. They claim that Goodwin–Cole sold Schweitzer fence which would not prevent skiers from hitting lift towers, with the knowledge or with reason to know that Schweitzer would use the fence for that purpose. They also brought suit against Goodwin–Cole for negligence in the design of the fence which Collins slid through before he struck the tower. And, they brought claims for breach of warranties and product liability.

Defendant Goodwin–Cole moved for summary judgment on November 28, 1990. Defendants Schweitzer and NASTAR together moved for summary judgment on

December 7, 1990. Plaintiffs responded to these motions on January 31, 1991. On September 4, 1991, the court heard oral argument from all parties on the two motions for summary judgment. Thus, having thoroughly considered all of the arguments presented herein, and based on the analysis to follow, this court finds that the defendants' motions for summary judgment on all claims shall be granted and this action shall be dismissed.

## II. ANALYSIS

### A. The Summary Judgment Standard

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." U.S.C.S. Court Rules, Rule 56(c), Federal Rules of Civil Procedure (Law. Co-op 1987).

The Supreme Court has made it clear that under Rule 56 summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element which is essential to his case and upon which he will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If the non-moving party fails to make such a showing on any essential element of his case, "there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2552.[1]

Moreover, under Rule 56, it is clear that an issue, in order to preclude entry of summary judgment, must be *both* "material" and "genuine." An issue is "material" if it affects the outcome of the litigation. An issue, before it may be considered "genuine," must be established by "sufficient evidence supporting the claimed factual dispute ... to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975) (*quoting First Nat'l Bank v. Cities Serv. Co., Inc.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). The Ninth Circuit cases are in accord. *See e.g., British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371 (9th Cir.1989).

According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party

(1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*Id.* at 374 (citation omitted).

In analyzing the motions for summary judgment in this case, the claims against Schweitzer and Schweitzer's response will be discussed first. Next, the claims and arguments relating to NASTAR and then Goodwin–Cole will be addressed.

### B. Claim Against Schweitzer

1. *Does the Idaho statute entitled Responsibilities and Liabilities of Skiers and Ski Area Operators bar Collins from recovering?*

As stated above, the plaintiffs brought suit against Schweitzer for negligence in

---

**1.** *See also* Rule 56(e), which provides in part: When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.
U.S.C.S. Court Rules, Rules of Civil Procedure, Rule 56(e) (Law. Co-op. 1987 & Supp.1991).

setting up the NASTAR race course, alleging that the finish line was too close to the lift tower struck by Michael Collins and that there was inadequate fencing and padding around the tower. There is a threshold issue in this case which determines much of the outcome of the motion for summary judgment by Schweitzer and NASTAR. That issue is whether or not the Idaho Responsibilities and Liabilities of Skiers and Ski Area Operators Act (Idaho Code §§ 6–1101 to 6–1109 (1990), the "skier statute" or "Act") applies to shield Schweitzer (and therefore NASTAR) from liability.

Section 6–1101 states that the legislative purpose of the Act was "to define those areas of responsibility and affirmative acts for which ski area operators shall be liable for loss, damage or injury, and *to define those risks which the skier expressly assumes and for which there can be no recovery." Id.* (emphasis added). The Act was passed in 1979 in an attempt to protect ski areas from potentially overwhelming liability from ski accidents. The legislature acknowledged the popularity of the sport both with Idahoans and the large number of people from out of state who ski here. The legislature also noted that the sport of skiing contributes significantly to the economy of Idaho.

Section 6–1103 spells out ten duties imposed upon ski area operators such as Schweitzer. The first nine of these duties deal with such things as the duty to mark trail maintenance vehicles and the location of snowmaking equipment; post the degree of difficulty of the various slopes; make known which slopes are closed and which are open; furnish a ski patrol, etc. Then the tenth duty (Section 6–1103(10)) is a sort of catch-all duty which all of the defendants contend means one thing and the plaintiffs argue means another. Because it is so important to this case, Section 6–1103(10) is given here in its entirety:

Every ski area operator shall have the following duties with respect to their operation of a skiing area:

. . . .

(10) Not to intentionally or negligently cause injury to any person; provided, that *except* for the duties of the operator set forth in subsections (1) through (9) of this section and in section 6–1104, Idaho Code, [which deals with the duty to maintain ski lifts], the operator shall have *no duty* to eliminate, alter, control or lessen the risks inherent in the sport of skiing, which risks include but are not limited to those described in section 6–1106, Idaho Code; and, that *no activities* undertaken by the operator in an attempt to eliminate, alter, control or lessen such risks *shall be deemed to impose on the operator any duty to accomplish such activities to any standard of care.*

Idaho Code § 6–1103 (1990) (emphasis added). Then Section 6–1106 spells out the duties of skiers:

It is recognized that skiing as a *recreational* sport is hazardous to skiers, regardless of all feasible safety measures which can be taken.

Each skier *expressly assumes the risk of and legal responsibility for* any injury to person or property which results from participation in the sport of skiing *including any injury caused by the following,* all whether above or below snow surface: variations in terrain; surface or subsurface snow or ice conditions; bare spots, rocks, trees, other forms of forest growth or debris; *lift towers and components thereof;* utility poles, and snowmaking and snowgrooming equipment which is plainly visible or plainly marked. . . . Therefore, *each skier shall have the sole individual responsibility for knowing the range of his own ability to negotiate any slope or trail, and it shall be the duty of each skier to ski within the limits of the skier's own ability, to maintain reasonable control of speed and course at all times while skiing* . . . .

Idaho Code § 6–1106 (1990) (emphasis added).

There has been one reported Idaho case interpreting this statute, *Northcutt v. Sun Valley Co.,* 117 Idaho 351, 787 P.2d 1159 (1990). In this case the Idaho Supreme

Court established that the statutory scheme works in the following manner. The court first cited the key language in Section 6–1103(10): "[N]o activities undertaken by the operator in an attempt to eliminate, alter, control or lessen such risks shall be deemed to impose on the operator any duty to accomplish such activities to any standard of care." *Northcutt* at 354, 787 P.2d 1159. The court then held that the specific ski area duties set forth in Section 6–1103 and Section 6–1104 are duties to eliminate, alter, control or lessen the inherent risks of skiing. *Id.* Then the court declared that the cited portion of the statute means that a ski area operator has *no other duties* to eliminate or lessen the inherent risks of skiing. *Id.* And finally, the court held that the last clause of Section 6–1103(10) *eliminates any standard of care* for a ski area operator in carrying out *any of the duties* described in Section 6–1103 and Section 6–1104. *Id.* at 355, 787 P.2d 1159.

The court then interpreted the duty of the ski area operator not to cause injury negligently to refer to first *the failure to follow whatsoever* the duties specified in Sections 6–1103 and 6–1104, and second to any duty *that does not relate* to eliminating, altering, controlling or lessening the inherent risks of skiing.

▪ The practical effect of the court's decision in *Northcutt* is that the duties described in Sections 6–1103 and 6–1104 are the *only* duties a ski area operator has with respect to the inherent risks of skiing and even anything an operator does to fulfill those duties *cannot be held to be negligence* because the operator had no duty to accomplish the activity to any standard of care. *Id.* In addition, anything else a ski area operator does to attempt to lessen the inherent risks of skiing *cannot* result in liability for negligence for that action. *Id.*

▪ According to Sections 6–1103 and 6–1106, injury resulting from a *ski lift tower* is specifically listed as an inherent risk of skiing. Therefore, under Section 6–1106,

anyone who strikes a ski lift tower while skiing is considered to have expressly assumed the risk and legal responsibility for any injury which results. In addition, under Section 6–1103(10), anything a ski area operator does to eliminate, alter, control or lessen the risks associated with lift towers—such as placing a fence around a tower or padding it—could not result in the operator being held liable for negligence.

Therefore, it is clear that if Collins had simply been skiing down the run and struck the tower, he could not recover. Yet the question is whether the fact that Schweitzer had set up a NASTAR race course and Collins was injured while he was racing on the course changes things so that the statute does not shield Schweitzer from liability.

Plaintiffs argue that the statute and *Northcutt* do not shield Schweitzer from liability because in setting up the course Schweitzer was not engaged in nor was the activity related to eliminating, altering, controlling or lessening the inherent risks of skiing. Rather, they maintain that Schweitzer increased the risks of skiing. They point out that when not racing one is free to choose how fast to go and how close to come to lift towers. On the other hand, racing encourages the skier to go as fast as possible and forces him to ski where the course goes.

▪ The plaintiffs next argue that assumption of the risk is no longer a defense in Idaho after *Salinas v. Vierstra*, 107 Idaho 984, 695 P.2d 369 (1985), in which the Idaho Supreme Court declared that Idaho's comparative negligence statute, Idaho Code § 6–801 (1971), prevented assumption of the risk from being a bar to recovery. However, the Idaho legislature, in enacting Section 6–1101, et seq., the skier statute, declared as public policy that assumption of the risk is a defense for claims based on the inherent risks of skiing. The specific statute controls.[2]

---

**2.** *See, for example, Farmers Nat'l Bank v. Wickham Pipeline Constr.,* 114 Idaho 565, 759 P.2d 71 (1988).

Schweitzer argues that the Act does apply to the facts of this case. It asserts that hitting a lift tower is an inherent risk of skiing and the fact that it occurred in the context of a NASTAR race should not affect the application of the statute. In addition, Schweitzer has presented evidence that its employees carefully planned the layout and location of the course in an attempt to eliminate or lessen the risks.

Despite the terrible tragedy suffered by Mr. Collins and his family, they are barred from recovering by operation of the Idaho skier statute. Under the Act, anything done in an attempt to eliminate or lessen the inherent risks of skiing cannot serve as the basis for a claim of negligence. In addition, hitting a lift tower is an inherent risk of skiing which the statute states all skiers expressly assume and for which they are barred from recovering.

In the opinion of this court, the fact that the injury occurred in the context of a NASTAR race does not change the application of the statute. NASTAR races are for recreational skiers—anyone may enter. The entrance fee is only $4.00. The races are essentially non-competitive—the racer is trying to improve his own skiing time. The plaintiffs' argument that the statute does not shield Schweitzer from liability because the injury occurred in the context of a NASTAR race is also weakened by the fact that the entire left side of the race course was lined by trees. Collins could have gone off the left side of the course at any time and hit a tree, which is another statutory inherent risk of skiing. Would Collins then claim that Schweitzer was negligent for having a NASTAR ski race near trees?

NASTAR races are held by many ski areas and are designed to enhance the skiing experience for recreational skiers. Setting up a NASTAR course is a normal part of running a ski area. Thus, anything a ski area does to eliminate or lessen the inherent risks of skiing in connection with setting up the race course or protecting skiers from hazardous obstacles *cannot* be the basis of liability for negligence. Under the statute, anything a ski area operator does to lessen the inherent risks of skiing does *not* impose any duty to accomplish such activity to any standard of care.

There are no genuine issues of material fact in plaintiffs' claim against Schweitzer for negligence. The facts are not disputed. This case turns on the correct interpretation of the Idaho statute. Under the Idaho skier statute, no standard of care can be imposed upon a ski area operator with respect to any action it takes in an attempt to eliminate, alter, control or lessen the inherent risks of skiing. Therefore, Schweitzer owed no duty to Collins with respect to the actions it took in carefully planning the location and layout of the race course or in fencing and padding the lift tower. It is axiomatic that where there is no duty, there can be no negligence. Consequently, the plaintiffs have failed to make a showing sufficient to establish the existence of two essential elements of their cause of action—duty and breach—and upon which they would have the burden of proof at trial. Summary judgment on this claim is therefore appropriate. *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552.

2. *Constitutionality of the Idaho statute.*

Plaintiffs have also challenged the Idaho statute on the grounds that it violates the equal protection clause of the Fourteenth Amendment of the United States Constitution and Article 1, section 2 of the Idaho Constitution. The plaintiffs argue that the statute unfairly singles out skiers and subjects them to unequal treatment in light of the fact that participants in other sports with inherent risks are not similarly barred from recovering.

The Idaho Supreme Court addressed this issue in *Northcutt.* The court held that the statute does not violate the Fourteenth Amendment or the Idaho Constitution because it is rationally related to a legitimate government interest—skiing is a popular sport which contributes significantly to the economy of Idaho and should therefore be encouraged and protected. The rational relationship test is the appropriate test to

be applied to this statute, and the Idaho court's decision is correct.

■ In reviewing a statute to determine if it violates the Equal Protection Clause of the Fourteenth Amendment, there are three levels of scrutiny. Determining the proper degree of judicial scrutiny is a function of two variables: the nature of the right affected, and the identity of the person asserting equal protection rights.

The first level is *strict scrutiny*, in which the court will treat as presumptively invidious those classifications that disadvantage a "suspect class," or impinge upon the exercise of a "fundamental right."[3] Such classifications will only be upheld if the classification has been precisely tailored to serve a compelling governmental interest.[4]

*Intermediate scrutiny* is the next level of judicial review, which is generally used to determine the validity of laws that classify according to gender and certain other criteria.[5] A law will be struck down under intermediate scrutiny unless it can be shown that it is substantially related to achievement of an important governmental purpose.[6] Mere administrative ease and convenience are not sufficiently important objectives to justify classifications subjected to intermediate scrutiny.[7]

Lastly, the lowest level of scrutiny is the *rational basis* test. This test requires merely that the statute classify the persons it affects in a manner rationally related to legitimate government objectives.[8]

■ The classification in the Idaho skier statute is not based upon a suspect classification or fundamental right or one of the criteria to be reviewed under intermediate scrutiny. In addition, the court will assume that the objectives of a statute articulated by the legislature are the actual purpose, unless it is shown that the circumstances indicate otherwise.[9] The purpose of the Idaho skier statute is to protect and promote an important state industry. Health, safety, and economic classifications not based on race or gender are reviewed at the minimum level of equal protection analysis.[10]

■ Therefore, in the case at hand the proper test is the rational basis test and the statute here would only violate Collins' right to equal protection if it did not bear any rational relationship to a legitimate government interest. Protection and enhancement of an important state industry is a legitimate government interest, and this court holds that the statute is rationally related to that interest. It is true that skiers who are injured must bear the burden of this statute, yet because the statute is rationally related to a legitimate government interest, this court will not substitute its own judgment for that of the legislature. The United States Supreme Court adopted this position in *Schweiker v. Wilson*, 450 U.S. 221, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981):

The Court has said that, although this rational-basis standard is "not a toothless

---

3. *Plyler v. Doe,* 457 U.S. 202, 216–17, 102 S.Ct. 2382, 2394–95, 72 L.Ed.2d 786 (1982).

4. *Id.* at 217, 102 S.Ct. at 2395. *See also Trimble v. Gordon,* 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977); *San Antonio Indep. School Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16, *reh'g denied,* 411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972).

5. *See Levy v. Louisiana,* 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968) (illegitimacy); *Weber v. Aetna Casualty & Surety Co.,* 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972) (illegitimacy); *Lalli v. Lalli,* 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978) (illegitimacy); *Craig v. Bor-*

en, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (gender).

6. *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976).

7. *See Stanley v. Illinois,* 405 U.S. 645, 656, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551 (1972); *Frontiero v. Richardson,* 411 U.S. 677, 690, 93 S.Ct. 1764, 1772, 36 L.Ed.2d 583 (1973).

8. *See United States v. Kinsey,* 843 F.2d 383, 393–94 (9th Cir.), *cert. denied,* 488 U.S. 836, 109 S.Ct. 99, 102 L.Ed.2d 75 (1988).

9. *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981).

10. *See United States v. Garren,* 893 F.2d 208 (9th Cir.1989).

one," *Mathews v. Lucas,* 427 U.S. 495, 510 [96 S.Ct. 2755, 2764, 49 L.Ed.2d 651] ... (1976), it does not allow us to substitute our personal notions of good public policy for those of Congress:

> "In the area of economics and social welfare, a State does not violate the Equal Protection Clause [and correspondingly the Federal Government does not violate the equal protection component of the Fifth Amendment] merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification *'is not made with mathematical nicety or because in practice it results in some inequity.'* *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78 [31 S.Ct. 337, 340, 55 L.Ed. 369] (1911)." *Dandridge v. Williams,* 397 U.S. [471] at 485 [90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970)]....

The Court has also said: "This inquiry employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor necessary." *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 314 [96 S.Ct. 2562, 2567, 49 L.Ed.2d 520] ... (1976). See also *United States Railroad Retirement Bd. v. Fritz,* 449 U.S. 166 [101 S.Ct. 453, 66 L.Ed.2d 368] ... (1980). As long as the classificatory scheme chosen by Congress rationally advances a reasonable and identifiable governmental objective, we must disregard the existence of other methods of allocation that we, as individuals, perhaps would have preferred.

*Id.* at 234–35, 101 S.Ct. at 1082–83 (emphasis added) (citations omitted).

### 3. *Effect of the release signed by Collins.*

It should also be noted that Collins signed a release of liability when he registered for the NASTAR race in which he was injured. The release was on the NASTAR registration form which Collins prepared at his home prior to the start of the ski season. The release was in fine print. The text of the release reads as follows:

> I hereby give NASTAR permission to use my photo for the promotion of NASTAR and NASTAR programs. I hereby release the sponsoring ski areas, their members or agents, and any person officially connected with this competition *from all liabilities, for any injury or damages whatsoever* arising from my participation or presence at a NASTAR-sanctioned competition.

*See* Exhibit A attached to Affidavit of Hollis Barnett in Opposition to Defendant Schweitzer, World Wide Ski Corp and Goodwin Cole Inc. Motion for Summary Judgment, filed January 31, 1991 (emphasis added).

Plaintiffs argue that the release is not enforceable because the duty not to negligently cause harm (Section 6–1103(10)) is a "public duty" that cannot be varied by agreement. This argument succeeds only if the plaintiffs' interpretation of the statute as applied to these facts is followed, i.e., Schweitzer's actions in setting up the race course and taking steps to protect skiers from hitting the lift tower are not related to eliminating or lessening the inherent risks of skiing.

Schweitzer argues that the release was binding on Collins and cites *Lee v. Sun Valley Co.,* 107 Idaho 976, 695 P.2d 361 (1984). In that case, the plaintiff signed a horseback riding rental agreement with the Sun Valley Co., a licensed outfitter and guide. Plaintiff was then injured. Outfitters' duties are also governed by statute,[11] and the court held that the release in the rental agreement was effective except to the extent that it purported to relieve the outfitter from meeting its "public" duties specified in the statute.

> [W]here the legislature has addressed the rights and duties pertaining to personal injuries arising out of the relationship between two groups, *i.e.,*

---

**11.** *See* Idaho Code § 6–1201, et seq.

employers/employees, outfitters and guides/participants, and has granted limited liability to one group in exchange for adherence to specific duties, then such duties become a "public duty" within the exception to the general rule validating exculpatory contracts. Therefore, while the agreement between Sun Valley and plaintiff does absolve Sun Valley from common law liabilities, it does not absolve Sun Valley from liability for possible violation of the public duty imposed by I.C. § 6–1204.

*Id.* at 979, 695 P.2d 361.

█ If Schweitzer failed to meet a public duty under the statute, the release would not shield it from liability for that breach. Yet it does not appear that Schweitzer has breached a public duty because to do that would require it to either: (1) fail to do anything whatsoever to fulfill the duties specified in the statute, or (2) to have acted in some way that does *not* relate to eliminating, altering, controlling, or lessening the inherent risks of skiing.

█ If the setting up of a NASTAR race course were held to take this case outside of the statute because it does not relate to eliminating, etc., the inherent risks of skiing, and Schweitzer were found to be negligent, then the release would not shield Schweitzer from liability under Section 6–1103(10). Yet, this court concludes that setting up a NASTAR race course is a normal part of running a ski area for recreational skiing. Therefore, under the statute, Schweitzer's carefully planning the layout and location of the course and fencing and padding the tower are deemed to be related to eliminating, altering, controlling or lessening the inherent risks of skiing. In addition, under the statute Collins is held to have assumed the risk of hitting the lift tower. Consequently, Schweitzer is shielded from liability under *both* the statute and the release because Schweitzer has not breached a public duty.

The court also notes that the Wyoming Supreme Court, in *Milligan v. Big Valley Corp.*, 754 P.2d 1063 (Wyo.1988), held that the release signed by a contestant in an ironman triathlon at Grand Targhee Ski Resort barred recovery after he was later killed while skiing in the competition.

In addition, Collins was very involved with amateur athletics in Sandpoint. He founded, organized and directed several amateur competitions, such as bicycle races and running races. According to Collins, these competitions always employed standard release forms, and Collins admits that he was aware of these and understood their purpose.

### C. Claim against World Wide Ski Corp. dba NASTAR

#### 1. *NASTAR'S liability for the negligence of Schweitzer.*

The plaintiffs are suing NASTAR on the basis of vicarious liability pursuant to the principal-agent relationship which they allege existed between NASTAR and Schweitzer. The plaintiffs argue that the contract between Schweitzer and NASTAR created the agency because in the contract NASTAR reserved the right to control Schweitzer.[12] Schweitzer and NASTAR have presented evidence which shows that Schweitzer was solely responsible for conducting the NASTAR race program at Schweitzer, that no NASTAR representatives ever even visited Schweitzer, and that all decisions regarding course layout and location were made solely by Schweitzer employees.

█ The plaintiffs rely on *Herbst v. Bothof Dairies, Inc.*, 110 Idaho 971, 719 P.2d 1231 (Ct.App.1986), which states that a principal's liability for the actions of an agent is based on the *right to control* rather than the actual exercise of control over an agent's actions in the scope of the agency. Nevertheless, the issue of agency

---

12. The pertinent portions of paragraph one of the contract read as follows: "NASTAR retains total authority over the NASTAR program ... and reserves the right to exclude results deemed invalid, set the rules of the competition, award

rights to commercial sponsors, and set and maintain standards for the conduct of NASTAR races." Affidavit of Paul Norum, filed Dec. 7, 1990, Exhibit A at 1 ¶ 1.

is moot because of the conclusion that Schweitzer cannot be held negligent since it did not violate a duty (given the provisions of the skier statute). Consequently, NASTAR cannot be liable either, because a principal cannot be held liable for the negligence of an agent when that agent has been held *not* negligent as a matter of law.

The effect of vicarious liability or respondeat superior is that a principal can be held liable for the negligence of an agent acting within the scope of the agency, even though the principal himself is not negligent and even if he did everything in his power to prevent it. *See* W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 69 at 499 (5th ed.1984). Nevertheless, the foundation of the action is still negligence, or other fault, on the part of the agent, and the ordinary rules of negligence are still applied to it. *Id.* Therefore, if the agent is found to be not negligent, then the principal cannot be held vicariously liable to the plaintiff because there is no negligence for which to be held vicariously liable. For these reasons, summary judgment on plaintiffs' claim against NASTAR based on vicarious liability is also appropriate.

2. *The effect of the release on NASTAR's liability.*

NASTAR asserts that the release shields it from liability; yet the plaintiffs maintain that because the release does not specifically name NASTAR, it cannot be protected by the release.

The release was in the NASTAR registration form. Therefore, it presumably was prepared by NASTAR. According to Idaho law, a release is to be strictly construed against the party who prepared it. *See Anderson & Nafziger v. G.T. Newcomb, Inc.,* 100 Idaho 175, 178, 595 P.2d 709, 712 (1979). Nevertheless, it is unnecessary to delve into the question of the release with respect to NASTAR's liability given the conclusion that NASTAR cannot be held vicariously liable because its al-

leged agent, Schweitzer, has been held to be not negligent as a matter of law.

3. *NASTAR'S duty to inspect.*

The plaintiffs also argue that NASTAR breached a duty to inspect the race course. The affidavits and depositions submitted by Schweitzer indicate that Schweitzer was solely responsible for the layout and location of the race course—all of the decisions were made by Schweitzer employees. According to the affidavit submitted by an officer of NASTAR, the ski area alone is responsible for the setting of a NASTAR race course. Plaintiffs' claim against NASTAR for failure to inspect the course is based on the premise that Schweitzer was negligent in setting the course. Again, this claim is precluded by the decision that Schweitzer cannot be found negligent due to the Idaho skier statute. The liability of NASTAR cannot be premised on the fact that Schweitzer was negligent in setting the course, because Schweitzer has been found to be not negligent as a matter of law.

D. Claims against Goodwin–Cole

The plaintiffs make various claims against Goodwin–Cole based on its sale of fence to Schweitzer. They claim that the fence Collins slid through before he struck the lift tower was sold by Goodwin–Cole to Schweitzer. To successfully assert any claim against Goodwin–Cole based upon the fence in question, the plaintiffs must come forward with sufficient evidence that it was fence sold by Goodwin–Cole which *caused* the injuries of Mr. Collins. *See Mico Mobile Sales & Leasing, Inc. v. Skyline Corp.,* 97 Idaho 408, 546 P.2d 54 (1975); *Challis Irrig. Company v. State,* 107 Idaho 338, 689 P.2d 230 (Ct.App.1984); *Idaho Pattern Jury Instruction No. 230* (1988 ed.); *Menne v. Celotex Corp.,* 861 F.2d 1453 (10th Cir.1988). The plaintiffs must show that Mr. Collins' injuries would not have occurred but for the failure of Goodwin–Cole's fence.

Yet the plaintiffs have failed to show what type of fence Collins slid through or

who sold it to Schweitzer. They have presented almost no evidence on this issue. With respect to Goodwin–Cole, plaintiffs can show that at some time a few years before the accident Goodwin–Cole did sell some fence to Schweitzer. Yet, after extensive discovery, all plaintiffs really have with respect to whose fence was involved in the accident is the answer to one question in their third set of interrogatories in which the general manager of Schweitzer says he "believes" that the fence came from Goodwin–Cole. On the other hand, the plaintiffs constantly refer to the fence as "pop fencing," which is distributed by one of Goodwin–Cole's competitors. None of the other Schweitzer employees seems to know what fence was used or who sold it to Schweitzer. One thought it was made by "Fall Line," a brand of fence Goodwin–Cole does not sell. The others were simply unsure.

On this limited evidence, the plaintiffs' claim cannot survive the motion for summary judgment by Goodwin–Cole. As noted by Goodwin–Cole, the United States Supreme Court in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) held:

> Nor are judges any longer required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party. Formerly it was held that if there was what is called a *scintilla* of evidence in support of a case the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, *but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.* (Footnotes omitted).

Id. at 251, 106 S.Ct. at 2511 (*quoting Improvement Co. v. Munson*, 14 Wall 442, 448, 20 L.Ed. 867 (1872)).

As noted above, under Rule 56 summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element which is essential to its case and upon which it will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Because the plaintiffs here have failed to make an adequate showing as to the type of fence Collins slid through or the manufacturer or seller of that fence, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2552. Therefore, Goodwin–Cole is entitled to a judgment as a matter of law.

*1. Claim of negligent design of fence.*

█ Based on the affidavits, exhibits, depositions and oral argument offered to the court, it is clear that Goodwin–Cole does not *manufacture* any fence; it is simply a distributor. The fences it sold to Schweitzer were manufactured by a company by the name of ADIC Safety Designs and Supplies, Inc. The fences were shipped by the manufacturer in sealed individual packages and remained sealed until delivered to Schweitzer. Goodwin–Cole took no part in the design or manufacture of the fence it sold to Schweitzer.

Idaho Code § [6–1407(1)] 6–1307(1) (1990) provides:

> In the absence of express warranties to the contrary, product sellers *other than manufacturers* shall *not be subject to liability* in circumstances where they do not have a reasonable opportunity to inspect the product in a manner which would or should, in the exercise of reasonable care, reveal the existence of the defective condition which is in issue; or *where the product seller acquires the product in a sealed package or contain-*

*er and sells the product in the same sealed package or container.*

(emphasis added).

This provision shields Goodwin–Cole from liability because it delivered the fences it sold to Schweitzer in sealed containers which had never been opened. It is not necessary to go on to address whether Goodwin–Cole could be liable for failure to inspect and to warn because it knew or had reason to know of a defect in the fence, because the plaintiffs have failed to provide any meaningful evidence whatsoever with regard to the type of fence involved or who sold it to Schweitzer.

### 2. *Claim for breach of warranty.*

According to the evidence offered by Goodwin–Cole, it sold Schweitzer "slope edging nets" for the purpose of marking ski trails, boundaries, and lift lines and to direct skier traffic. These nets or fences were not sold to be used to protect skiers from fixed objects. Goodwin–Cole sells a different, stronger type of fence designed for that purpose. Goodwin–Cole, therefore, argues that when it sold the "slope edging nets" to Schweitzer they were fit for ordinary use and fit for the particular purpose for which they were purchased. Goodwin–Cole denies that any express warranties were made to Schweitzer regarding the "slope edging nets."

The plaintiffs acknowledge that they have no evidence of any express warranties regarding the nets/fences. In addition, the plaintiffs do not have any evidence showing that the fences were sold for the purpose of protecting skiers from fixed objects like lift towers. Consequently, summary judgment is appropriate with respect to the claim for breach of warranties, and the plaintiffs acknowledge this in their memorandum.

## III. CONCLUSION

Based on the foregoing, summary judgment will be granted for *all* defendants. The Idaho skier statute bars the plaintiffs from recovering from Schweitzer. With respect to the release signed by Mr. Collins, this court finds that Schweitzer has not breached a public duty. Therefore, *both* the statute and the release shield Schweitzer from liability.

Because Schweitzer is entitled to summary judgment, the court holds that NAS-TAR is also entitled to summary judgment. NASTAR cannot be vicariously liable for the negligent acts of Schweitzer if, as a matter of law, Schweitzer was not negligent.

Lastly, Goodwin–Cole is entitled to summary judgment because the plaintiffs have failed to come forward with sufficient evidence to justify the case going to a jury on the issue of causation. The plaintiffs have no hard evidence as to what type of fence Collins slid through or where it came from. All they have is the naked belief of one of Schweitzer's employees. A jury would be engaged in sheer speculation as to the manufacturer and seller of the fence in question.

## IV. ORDER

Based on the foregoing and the court being fully advised in the premises,

IT IS HEREBY ORDERED that the Motion for Summary Judgment by Defendants Schweitzer and NASTAR should be, and is hereby, GRANTED.

IT IS FURTHER ORDERED that the Motion for Summary Judgment by Defendant Goodwin–Cole should be, and is hereby, GRANTED, and that this action shall be DISMISSED.